[This decision has been published in *Ohio Official Reports* at 95 Ohio St.3d 1201.]

PARRISH, APPELLANT, *v.* PARRISH, APPELLEE.

[Cite as *Parrish v. Parrish*, 2002-Ohio-1623.]

*Appeal dismissed as improvidently allowed.*

(No. 00-1963—Submitted October 2, 2001—Decided April 10, 2002.)

APPEAL from the Court of Appeals for Ross County, No. 98CA2470.

_____

{¶ 1} The cause is dismissed, *sua sponte*, as having been improvidently allowed.

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

RESNICK and LUNDBERG STRATTON, JJ., dissent.

_____

LUNDBERG STRATTON, J., dissenting.

{¶ 2} Because I believe that there is a critical issue at stake, I dissent from the majority's judgment to dismiss this case as having been improvidently allowed.

{¶ 3} Mary R. Parrish, petitioner-appellant, and Royce L. Parrish, respondent-appellee, were married on March 16, 1996. Two children were born to the couple during their marriage, Brooke Anne, born July 14, 1996, and Troy James, born October 18, 1998. On October 30, 1998, Mary filed for divorce. She also requested a Civ.R. 75(I) restraining order to protect marital estate property, which the trial court granted on October 30, 1998.

{¶ 4} In her complaint, Mary sought a civil protection order, alleging domestic violence. Attached to the complaint were photographs depicting damage to the parties' marital home, as well as four supporting affidavits. The trial court issued an *ex parte* civil protection order on October 30, 1998, and set the matter for a full hearing on November 5, 1998, in accordance with R.C. 3113.31. Royce requested a continuance, which the court granted, rescheduling the hearing for

November 24, 1998. Royce filed an answer to Mary's complaint. In addition, he filed his own petition for a civil protection order.

{¶ 5} On November 18, 1998, a magistrate issued Civ.R. 75 orders temporarily giving parental rights and responsibilities for the minor children to Mary, ordering temporary child support, and continuing the terms of the October 30, 1998 *ex parte* order providing that Royce "have no reasonable rights of companionship subject to further hearing."

{¶ 6} The trial court held a full hearing on the domestic violence complaint on November 24, 1998. Mary testified and presented the testimony of five witnesses. The first witness to testify was Clint J. Ford, Mary's father, who lived next door to Mary and Royce and had been acquainted with Royce for about five years. Mr. Ford stated that Royce had a child named B.J. from a previous relationship, who at that time lived with his mother in Circleville, Ohio. According to Mr. Ford, in the spring of 1997, he observed B.J., who was then approximately three years old, with bruises over the biggest part of his buttocks. Later in the fall of 1997, Ford testified, he again observed bruises on B.J.'s buttocks. Mr. Ford testified that he knew that B.J. was potty training at the times that he saw the bruises.

{¶ 7} Mr. Ford testified that Royce was quick to anger with B.J. and Brooke, the two oldest children. According to Mr. Ford, Royce damaged the walls and cabinets of the marital residence when he was angry. Mr. Ford testified that on one occasion, Royce kicked down the door of the couple's home. Mr. Ford testified that Mary called him to repair damage that Royce did to the home.

{¶ 8} Mr. Ford further testified that in January 1997, he was out in front of his house when Royce and Mary were in his driveway, and he observed Royce kick the window out of Mary's car. On cross-examination, Mr. Ford testified that he saw Mary toss a C.B. radio toward Royce that day.

{¶ 9} Linda Pardue, a friend of the Ford family, testified. Pardue recalled an occasion on which she was present with Mary and Royce at the Eagles when Royce became angry with Mary and slammed things around on the table and left. Pardue also recalled a visit to the Parrish home during the spring of 1998 when Royce became angry with Mary and slammed the back door of the house and left.

{¶ 10} Mary's counsel asked Pardue about Royce's alleged violence toward B.J., but Royce's counsel objected on the basis that the testimony was irrelevant because B.J. was not a party to the case. The trial court sustained the objection. Although Ms. Pardue was not permitted to testify further regarding this matter, Mary's counsel proffered Pardue's testimony that in 1996, she observed a bruise or a red mark in the shape of a handprint on B.J.'s face. Jerry Pardue, a friend of the Ford family and husband of witness Linda Pardue, testified that he had seen Royce lose his temper and get angry and that Royce has a "relatively short" fuse.

{¶ 11} Mary's mother, Judy Ford, testified on her daughter's behalf. Mrs. Ford testified about the incident in which Royce kicked the window out of Mary's car. According to Mrs. Ford, Royce wanted the C.B. radio, and Mary tossed it to him. Mrs. Ford testified that in the summer and fall of 1998, Royce would call Mary and would "holler and scream" on the answering machine and "would holler at her and tell her to pick the phone up and he would use the 'F' word all the time on it."

{¶ 12} Mary's counsel asked Mrs. Ford about injuries she had observed on B.J., but the trial court again sustained an objection. Mary's counsel proffered Mrs. Ford's testimony that B.J.'s back, legs, and bottom were covered with bruises in the spring of 1997.

{¶ 13} Mary's counsel also proffered Mrs. Ford's testimony that when she confronted Royce about B.J.'s injuries, Royce's answer was to the effect that "he's my kid and I'll do whatever I want to to him," and that "he would be willing to do the same thing to Brooke." Mrs. Ford also would have testified that in the fall of

1997, she again saw bruises all over B.J. and that when she asked Royce to explain the injuries, he told Mrs. Ford that B.J. had fallen down the stairs, an explanation that seemed very unlikely to her to account for B.J.'s injuries. Finally, Mrs. Ford would have testified that B.J. always appeared to be frightened of Royce.

{¶ 14} Finally, Mary testified. First, she testified about the damage to the walls of the couple's home. Mary stated that when Royce would get angry with her, he would punch the walls or throw something. She further stated that he once threw their coffee table through one of the walls in their home.

{¶ 15} In describing the incident where Royce kicked the window out of the car in January 1997, Mary testified that Royce wanted to take the car. Mary stated that she was sitting in the driver's seat when Royce kicked out the rear driver's side window, shattering the glass. She admitted that she had tossed the C.B. radio to Royce.

{¶ 16} At the close of Mary's evidence, Royce moved the court to dismiss the request for the civil protection order. The trial court stated that the burden of proof was by clear and convincing evidence. The court concluded that it had not heard testimony that would convince the court by clear and convincing evidence or even by a preponderance of the evidence that Royce had attempted to cause or recklessly caused bodily injury to Mary. Further, the trial court stated that it did not believe that there had been evidence that either Brooke or Troy had been abused. The trial court dismissed the cause of action for a civil protection order and dissolved the *ex parte* protection order. Royce withdrew his petition for a civil protection order.

{¶ 17} On December 22, 1998, Mary filed a notice of appeal in the Court of Appeals for Ross County. On January 11, 1999, Mary filed a motion in the court of appeals seeking a stay of the trial court's November 25, 1998 dismissal of her petition for a civil protection order. Specifically, Mary requested an order reinstating the *ex parte* civil protection order that was originally granted on October

30, 1998. The court of appeals denied Mary's motion for stay on March 19, 1999. Royce's counsel sought leave to withdraw, which was granted. On May 18, 1999, the trial court granted a final decree of divorce to the parties. The court of appeals affirmed the judgment of the trial court that dismissed her petition for a civil protection order.

{¶ 18} This court originally accepted this case to decide whether during a hearing on a civil protection order under R.C. 3113.31, it is an abuse of discretion for a trial court to exclude evidence that the respondent abused family or household members other than those for whom the protection order is sought. For the reasons that follow, I would find that such evidence should not be excluded.

{¶ 19} "Domestic violence" is defined by R.C. 3113.31(A)(1) as "the occurrence of one or more of the following acts against a family or household member:

"(a) Attempting to cause or recklessly causing bodily injury;

"(b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;

"(c) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code."

{¶ 20} As an alternative to filing a criminal charge of domestic violence, R.C. 3113.31 provides the victim of domestic violence the ability to seek immediate relief through a civil protection order, which enjoins the respondent from further violence against the family or household member. R.C. 3113.31(C) and (E). Upon the filing of a petition for a civil protection order, if the petitioner requests an *ex parte* order, the trial court must hold an *ex parte* hearing the same day. R.C. 3113.31(D)(1). Immediate and present danger of domestic violence to the family or household member constitutes good cause for issuing an *ex parte* order. *Id.*

{¶ 21} After granting an *ex parte* order, the trial court must set the matter for a full hearing within seven court days. R.C. 3113.31(D)(2)(a). After the full hearing on the matter, the trial court may either dismiss the *ex parte* civil protection order or grant the protection order. R.C. 3113.31(E)(1). When granting a protection order, the trial court must find that the petitioner has shown *by a preponderance of the evidence that the petitioner or the petitioner's family or household members are in danger of domestic violence. Felton v. Felton* (1997), 79 Ohio St.3d 34, 679 N.E.2d 672, paragraph two of the syllabus, citing R.C. 3113.31(D).

{¶ 22} The decision whether to grant a civil protection order lies within the sound discretion of the trial court. *Deacon v. Landers* (1990), 68 Ohio App.3d 26, 587 N.E.2d 395. Therefore, an appellate court should not reverse the judgment of the trial court absent an abuse of discretion. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

Burden of Proof

{¶ 23} At the hearing, I believe that the trial court misstated the burden of proof required for a civil protection order as proof *by clear and convincing evidence.* In its entry, the trial court stated: "The Court weighing the evidence finds that the testimony failed to establish *by clear and convincing evidence (or even by a preponderance of the evidence)* that Defendant had committed any act of domestic violence as defined in Ohio Revised Code Section 3113.31(A)(1)(a), (b), or (c) as to Plaintiff or the minor children, Brooke Anne Parrish and Troy James Parrish, who are parties to this proceeding." (Emphasis added.)

{¶ 24} Continuing, the trial court noted on two occasions that petitioner failed to show by "clear and convincing" evidence that domestic violence occurred. At one point, the court referred to "a preponderance," but later the court reverted to

"clear and convincing evidence." Therefore, it is very *unclear* what burden the trial court eventually applied, although it clearly did seem to believe that clear and convincing evidence was the required standard. Thus, I would find that the trial court erred as a matter of law in applying the incorrect standard of evidence.

{¶ 25} Accordingly, I would hold that the court of appeals erred in finding that the trial court *clearly* stated in its decision that petitioner failed to establish *by a preponderance of the evidence* that respondent committed any act of domestic violence as to petitioner or her children. The record is very *unclear* on this point.

Evidence

{¶ 26} In seeking to establish that Mary or her children were in danger of domestic violence, Mary's counsel sought to introduce evidence that Royce abused B.J., his child from a previous relationship who then resided with his mother. The trial court, however, ruled that evidence of respondent's abuse of his son B.J. was not relevant to the issue of whether Mary and her two children were in immediate danger of domestic violence inflicted by Royce. The trial court concluded that respondent's child B.J. was not a party to the domestic violence and stated that it would not make a custody or companionship order because one had already been made in the domestic relations case and because the civil protection order was not sought for B.J.

{¶ 27} I believe that the trial court erroneously presumed that a temporary custody order under Civ.R. 75 made the proffered testimony of Royce's treatment of his older child irrelevant to the request for a civil protection order. While the civil protection order *could* have allocated parental rights under R.C. 3113.31(E)(1)(d), it did not do so. The Civ.R. 75 order in force at the time of the full civil protection order hearing *had already temporarily allocated* all parental rights and responsibilities to Mary. She did not need to seek parental rights through her petition for a civil protection order because the November 18, 1998 Civ.R. 75 order already granted her sole custody. Rather, in petitioning the court for a civil

protection order, Mary was seeking protection for herself and her children from domestic violence, a very different need.

{¶ 28} In fact, the Tenth District Court of Appeals in *Thomas v. Thomas* (1988), 44 Ohio App.3d 6, 540 N.E.2d 745, compared R.C. 3113.31 and Civ.R. 75 and concluded that "while the relief available under both provisions is somewhat similar, it is directed to a different purpose. The purpose of a civil protection order issued pursuant to R.C. 3113.31 is to provide protection from domestic violence and, incidental to that relief, to provide for support and shelter; the relief is available to a broader range of petitioners; the scope of relief is broader; there is no residency requirement; and a violation of a civil protection order can form the basis of a criminal offense, R.C. 2919.27. Civ.R. 75, while providing for financial support and custody, does so only incidentally to a divorce or dissolution and is available only to parties to the action." *Id.* at paragraph two of the syllabus.

{¶ 29} Clearly, the remedies provided in a Civ.R. 75 order are *not* in lieu of those provided in an R.C. 3113.31 civil protection order. In fact, R.C. 3113.31(G) states, "The remedies and procedures provided in this section are *in addition to, and not in lieu of*, any other available civil or criminal remedies." (Emphasis added.) Accordingly, nothing precludes the court from issuing a protection order even though Civ.R. 75 orders are in place, and a Civ.R. 75 order does not preclude admission of evidence of abuse of a petitioner or respondent's child or other family or household member during the hearing on the protection order.

{¶ 30} Civil protection orders specifically protect family or household members. R.C. 3113.31(A)(1). R.C. 3113.31(A)(3)(a)(ii) specifically states that "a child of the respondent" who is residing with or has resided with the respondent is a "family or household member" within the meaning of R.C. 3113.31(A)(1). Therefore, I would find that evidence of Royce's physical abuse of his son B.J. was relevant under R.C. 3113.31.

**{¶ 31}** Accordingly, I would hold that in a hearing on a civil protection order under R.C. 3113.31, a trial court must consider evidence that respondent abused family or household members other than those for whom the protection order is sought.

Totality of the Circumstances

**{¶ 32}** After holding that Mary did not support her claims with evidence sufficient to defeat Royce's motion to dismiss, the court of appeals went on to address Mary's contention that the trial court erred in sustaining Royce's motion to dismiss because it refused to consider the totality of the circumstances of Royce's violence and threats of violence.

**{¶ 33}** The court of appeals concluded that evidence of abuse of respondent's son B.J. consisted entirely of the testimony of petitioner's mother and father concerning an incident that allegedly occurred more than a year before trial. On the contrary, there was testimony from three witnesses of three separate instances of excessive bruising on B.J. Linda Pardue's testimony was proffered that in 1996, she observed a bruise or red mark in the shape of a handprint on B.J.'s face. Mary's father testified about seeing bruises on B.J. in the spring of 1997 and again in the fall of 1997. Moreover, he testified about being present when Mrs. Ford confronted Royce about his abuse of his son B.J. and Royce told Mrs. Ford that B.J. was his child and he would do with him what he wanted.

**{¶ 34}** Mrs. Ford's testimony was also proffered that she had seen bruises on B.J. in the spring and fall of 1997, that B.J. always appeared to be frightened of Royce, and that Royce made statements to the effect that "he's my kid and I'll do whatever I want to to him" and that he would "be willing to do the same thing to Brooke."

**{¶ 35}** Testimony regarding Royce kicking the window out of the family car while Mary was in the car was evidence of violence perpetrated in Mary's presence. Moreover, there was evidence presented at the hearing about Royce's

tendency to throw, slam, and otherwise damage objects in the home, as well as damage the walls and door of the couple's home. Although the children may not have been present at some of these incidents of violence, "[c]hildren are often traumatized by the 'climate of violence' in their homes even if they do not witness an attack." Voris, Civil Orders of Protection: Do They Protect Children, the Tag-Along Victims of Domestic Violence? (1991), 17 Ohio N.U.L.Rev. 599, 606.

{¶ 36} Incomprehensibly, although the court of appeals acknowledged the testimony about *an incident* of abuse of B.J. (there was evidence with regard to three incidents), it concluded that evidence of Royce's predilection toward violence never established that he directed his anger toward her or her children. Moreover, the court concluded that Mary's evidence failed to establish an immediate threat of physical harm, which the court noted was required by R.C. 3113.31(D) for the issuance of an *ex parte* civil protection order, as well as by R.C. 3113.31(A)(1)(b) to support the grant of a CPO after the hearing. The court held that evidence presented by petitioner "consisted of events mostly remote in time to the petition for domestic violence and did not support any finding that the appellee threatened her or her children."

{¶ 37} Courts cannot look at incidents of domestic violence in a vacuum. Domestic violence is almost always a series of incidents that gradually escalate into increasing acts of brutality, repeating themselves in cycles. Thus, in a petition for a civil protection order, evidence of respondent's prior acts of violence toward the petitioner or the respondent's family or other household members should be admissible to prove by a preponderance of the evidence that petitioner and her children are in danger of domestic violence.

Placing Another Person by Threat of Force in Fear of Imminent Serious Physical Harm

{¶ 38} The court of appeals seemed to require that Royce *verbally* threaten Mary, as evidenced by the comment that "the witness could not testify that appellee

made any threats to appellant." Royce's actions certainly are as telling as his words, if not more so. Nothing in the plain language of R.C. 3113.31 requires the respondent to *verbally* threaten the petitioner before the trial court may find that the respondent placed the petitioner or another family or household member by the threat of force in fear of imminent serious physical harm. R.C. 3113.31(A)(1)(b). Moreover, it defies common sense that the court of appeals considered evidence that Royce threw a piece of furniture through the wall, knocked down a door, put dents in the walls, and smashed a car window while Mary was in the car, but still concluded that Mary was not in danger of domestic violence because Royce never made any *verbal* threats to her.

{¶ 39} I would find that the reasonableness of a petitioner's fear should be measured with reference to her history with respondent. See *Eichenberger v. Eichenberger* (1992), 82 Ohio App.3d 809, 613 N.E.2d 678. The petitioner should not be required to testify specifically that he or she fears the respondent. Thus, I would hold that pursuant to R.C. 3113.31, in determining whether a petitioner is in danger of domestic violence, threats of violence, whether physical or verbal, should be considered. Even giving great deference to the trial court's ability to evaluate credibility, I simply cannot see how the court of appeals found that there was no danger of domestic violence directed toward Mary or her family, given the independent and numerous witnesses supporting Mary's petition. Therefore, I would find that the court of appeals erred in affirming the trial court's dismissal of the petition for a civil protection order.

## Conclusion

{¶ 40} More than three years have passed since Mary first petitioned the trial court for a civil protection order to protect herself and her family from further abuse by Royce. An inexplicable twenty-one months elapsed from the time Mary filed the notice of appeal in the court of appeals to the time of disposition by the court of appeals. I am compelled to note that particularly in a matter such as a

petition for a civil protection order to protect a victim and her children from domestic violence, a delay of this magnitude is unacceptable.

{¶ 41} Although three years have passed since the filing of this case, the correct resolution of this case is still important, not only to the parties, but to give guidance to the lower courts in these matters. Judge Michael J. Voris's words quoted by Justice Resnick in *Felton v. Felton,* bear repeating:

"In his article entitled 'The Domestic Violence Civil Protection Order and the Role of the Court,' Judge Michael J. Voris of the Clermont County Domestic Relations Court, cogently expressed this obligation:

" 'Advanced societies take intra-family violence seriously. Only in the last twelve years has this problem become a focus of attention and national concern. The Ohio Legislature has passed one of the most comprehensive * * * statutes authorizing Civil Protection Orders to combat domestic violence. Because the language of the statutes is broad, the response of the Court has a profound impact in protecting the victims of domestic violence. Judges have the power and authority to implement the legislation. It is critical that Judges and Referees be aware of the severity of the domestic violence problem and make efforts to remain informed about the recent domestic violence legislation. Continuing education as to the realities of all forms of domestic violence will help to remove the shroud of secrecy and break the cycle of violence. Judges and Referees can play a leadership role in enlightening and educating attorneys, parties and the community in general about the severity of the domestic violence issues and the civil legal remedies that exist for victims of domestic violence. The Attorney General's Task Force on Family Violence urges Judges not to underestimate their ability to influence the respondent's behavior. Judges can communicate a powerful message about the justice system's view of domestic violence within their own courtrooms.

" 'The Ohio Legislature has made a laudatory beginning in responding to the problems of domestic violence. The legislation that provides for Civil

Protection Orders is responsive to the immediate needs of the victims and provides a necessary alternative and supplement to criminal legal remedies. However, the legislation cannot achieve its full potential without the careful and responsible utilization by Judges and Referees.' * * *

"The consequences of domestic violence are serious and severe. Protection orders can be an effective tool when used in conjunction with provisions in divorce and dissolution decrees and other separation agreements. Ohio's courts must make themselves aware of the authority they have been granted by the legislation to implement all of these protection orders." *Felton*, 79 Ohio St.3d at 45, 679 N.E.2d at 680, quoting Voris, The Domestic Violence Civil Protection Order and the Role of the Court (1990), 24 Akron L.Rev. 423, 432.

{¶ 42} Therefore, I would hold that in a hearing on a civil protection order under R.C. 3113.31, a trial court should consider both physical and verbal acts that place a petitioner in fear of imminent serious physical harm, and any evidence that respondent abused family or household members other than those for whom the protection order is sought. Accordingly, because the trial court failed to apply the correct burden of proof and refused to consider evidence relevant to the disposition of the civil protection order, I would reverse the judgment of the court of appeals and remand the cause to the trial court for rehearing consistent with this opinion.

{¶ 43} Because the majority today dismisses a case involving an issue in which I believe guidance is greatly needed, I respectfully dissent.

RESNICK, J., concurs in the foregoing dissenting opinion.

_____

*Katherine Hine*, for appellant Mary R. Parrish.

*Jeremiah B. McKenna*, for *amici curiae* Ross County Network for Children, Alliance for the Rights of Children, National Alliance for Family Court Justice, National Committee for the Rights of the Child, One Voice, and Protection Parents Research Network.

_____